## WILLIAMS *et al.* *v.* GOODYEAR METALLIC RUBBER SHOE CO.

*(Circuit Court, D. Connecticut.* February 6, 1892.)

1. **PATENTS FOR INVENTIONS—INVENTION—RUBBER SHOES.**
   Letters patent No. 131,201, issued September 10, 1872, to Isaac F. Williams, for a rubber overshoe with bellows flaps, are void for want of invention.

2. **SAME.**
   In view of the prior state of the art, as shown by the English patent to Stephen Norris, and the Evory & Heston shoes, (American patent No. 59,375, issued November 6, 1866,) the conception of a bellows flap in a rubber overshoe, for the purpose of making it water-tight, was not the exercise of inventive genius.

3. **SAME—MECHANICAL ADAPTATION.**
   The adaptation of the bellows flap to the arctic overshoe by running the hinge of the flap forward to a point near the arch of the shank, in order to give sufficient room for the insertion of the shoe-clad foot, thus placing the hinge almost at right angles to the draft line of the shoe, did not require inventive faculty.

4. **SAME.**
   Nor did it require inventive faculty to abandon the use of separate gores, and make the flap integral with the vamp and the quarter, since experiment would promptly show that in inserting the shoe-clad foot the strain would be too great for the seams, and the substitution of an integral extension for a gore would naturally occur to the shoemaker.

5. **SAME—EXTENT OF CLAIM—ESTOPPEL.**
   The application for letters patent No. 166,669, issued August 10, 1875, to Isaac F. Williams, having been made for an improved rubber boot as distinguished from a shoe, and the whole course of the proceedings in the patent-office having proceeded on that theory, the inventor is estopped to claim that the patent covers a rubber shoe.

In Equity. Bill by Isaac F. Williams and the National Rubber Company against the Goodyear Metallic Rubber Shoe Company for infringement of patents. Bill dismissed.

*Wilmarth H. Thurston* and *Charles E. Mitchell*, for plaintiffs.

*John K. Beach* and *Charles R. Ingersoll*, for defendant.

SHIPMAN, District Judge. This is a bill in equity founded upon the alleged infringement by the defendant of letters patent No. 131,201, dated September 10, 1872, for an improved cloth and rubber gaiter overshoe, and letters patent No. 166,669, dated August 10, 1875, for an improvement in rubber boots. Each patent was granted to Isaac F. Williams, the present owner and one of the plaintiffs. The National Rubber Company is the exclusive licensee under each patent.

No. 131,201 was an improvement upon the well-known cloth and rubber shoe known as the "arctic," and was designed to render the shoe water-proof. The specification and drawings of the patent represented that it consisted in a peculiar construction of double water-proofed, jointed flaps, which were extensions of the vamp and quarter, and integral therewith, and that they were "so arranged that the flap tongue, passing over the instep, will draw equally upon the sides of the quarter when buckled to the foot." The claim of the patent was as follows:

"As a new article of manufacture, a cloth and rubber gaiter overshoe having a double water-proof flap, composed of extensions of the vamp and quarter, folded on each side of the instep, and provided with a buckle and flap tongue, which are arranged to draw equally on each side of the quarter across the instep, substantially as described."

In May, 1880, two suits in equity against L. Candee & Co.,—one by the present plaintiffs, upon the patents now in controversy, and the other

by Evory & Heston and the National Rubber Company, upon letters
patent No. 59,375, dated November 6, 1866, granted to Evory & Heston
for an improved shoe,—were tried in this court. The respective opin-
ions are in 2 Fed. Rep. 683 and 542. It was claimed that each patent
was being infringed by the defendants in the manufacture of the same
shoe. In the suit upon the Williams patent the Evory & Heston patent
was not introduced in evidence. The suit was originally defended, not
upon the ground that the Williams extension was not a patentable nov-
elty, if the proper, limited construction should be given to the patent,
but upon the ground that in view of the Stephen Norris English patent
of 1856 the Williams invention was limited to the "cut" of vamp and
quarter, and of their extension into a flap tongue, which was shown in
the drawings, and that the defendant's shoes had a different "cut," which
was a union of the arctic quarter and of an extension of the vamp, which
was the Norris gore, but, if the Williams patent should receive a broad
construction, it was anticipated by the Norris shoe. The plaintiff's re-
ply was that this shoe was not a water-tight shoe, but had necessarily a
leak-hole at the apex of the gore, and that at the union of the vamp,
quarter, and gore there was no turning of the water by a fold of the leather,
and therefore Williams was a pioneer in making a water-proof overshoe
by means of overlapping flaps. The court was of opinion that the "im-
provement upon the arctic shoe consisted in overlapping the vamp and
the quarter beneath the rubber foxing, and extending the vamp and
quarter so as to form bellows-like, water-excluding flaps, folded on each
side of the instep, and buckled together over the instep;" and, further,
that "the gist of the Williams invention consisted in such a cut of vamp
and quarter that the two overlapped or folded upon each other, and
thereby the leak-hole at the junction of the Norris gore with vamp and
quarter was obviated;" and that the patent was "not to be limited to the
precise shape of the 'cut' of each part of the extension which is shown
in the drawings, but it covers, also, such other forms of cut which are
substantially like the pattern shown and described, and which accom-
plish the same result." In this case, the defendant relied upon the Evory
& Heston patent, under which, as a licensee, it claimed to have made
the infringing shoes, and defended upon the ground that the shoe de-
scribed in the patent was an anticipation of the Williams invention, and,
if not, that, in view of the state of the art at the date of the Williams
improvement, it was not a patentable invention. While the complain-
ants were taking evidence in reply to the defendant's case, the latter of-
fered the Norris patent of 1856 to show the state of the art, but offered no
oral testimony in regard to said patent. In the case of *Burt* v. *Evory*, 133
U. S. 349, 10 Sup. Ct. Rep. 394, the supreme court held that, in view
of the Norris shoe and other shoes which were in existence at the date
of the Evory & Heston application, the shoe therein described was not
a patentable invention. This shoe was made of leather, and was in-
tended to cover a stocking-clad foot. It had an expansion gore flap made
of a separate piece of leather, the external fold of which was attached to
and in front of the quarter, and the internal fold of which was attached
to and in rear of the vamp. The apex of the gore was directly in front

of the ankle line.  The vamp and quarter overlapped at the point of junction for the purpose of holding each other together, and there was no leak-hole at the apex of the gore.  It is obvious that the Evory & Heston shoe could not be used without alteration as an overshoe for a shoe-clad foot.  So long as the hinge of the flaps is in a line with the ankle line, there will not be room enough at the instep to receive a shoe, with its protruding and rigid heel.  A mere enlargement of the flaps at that point will not make an acceptable overshoe.  The location of the flaps must be changed.  A shoe, in order to be generally useful, must be a substantial improvement upon the Evory & Heston shoe.  To that end the overshoe would naturally be a brogan, and an improvement upon the arctic, in which the quarter overlapped and buckled upon the instep over a large vamp, which could be turned back to receive the shoe-clad foot.  In defining and explaining the nature of the Williams invention, the patentee and one of the plaintiffs' experts substantially abandoned the position in the *Candee Case*, that the gist of the invention consisted in that overlapping of the vamp and quarter (which in the Williams shoe was below the foxing) whereby the Norris leak-hole was obviated.  Their position is that the improvements in the location of the flaps, and the principle upon which they were constructed, constituted the invention, and made for the first time a water-tight cloth and rubber overshoe.  It is truly said that the line on the overshoe extending from the instep to the heel is the one upon which the overshoe must have capacity to open or extend.  This line is called the "draft line," and by the shoemakers is called the "line of the instep measure."  Furthermore, after the overshoe has been drawn over the inner shoe, the opening, which has been extended for this purpose, must be contracted; and the heel portion of the overshoe must be drawn up to, and held firmly against, the heel of the inner shoe.  In the opinion of the plaintiffs, the Williams invention consisted in abandoning the gore or gusset idea, and in extending or prolonging the vamp of the arctic overshoe, and folding it so that the line or hinge of the fold would be substantially at right angles to the draft line, and that the apex of the fold would be in a line with the forward edge of the extended quarter, and the two would meet at the edge of the foxing.  Mr. Williams testifies that in his experiments he tried separate gores or gussets, and was forced to abandon them, and make his flaps integral with the vamp and quarter, because in no other way could he make them resist the strain which was brought upon the seams of the gussets at the apex of the gore.  He also says that the construction of the arctic was such that it was liable to tear at the point of contact of quarter and foxing, and sometimes the opening of the shoe was so small that it would give way at that point, and that to prevent this liability he extended the vamp, which folded upon itself, so that it joined the quarter at its forward line; the apex or bottom of the fold meeting the forward edge of the quarter.  This apex was about on a line with the forward edge of the quarter of the old arctic.

The question in the case is that of patentable improvement, in view of the Evory & Heston shoe and the arctic overshoe.  In other words, bellows flaps being known, and an existing thing, in leather, and an arc-

tic rubber overshoe being well known, did it require invention to place the Williams bellows flaps upon a cloth and rubber brogan? The mere fact that the pre-existing devices were in leather is not important. There is much more force in the necessary differences between a flap in a shoe for a stocking-clad foot and in an overshoe; and it is necessary to see whether these differences, in view of the existence of the arctic shoe, presented real difficulties, which required inventive genius to overcome. It is said, in the technical language which is used in the case, that the patentee made a patentable departure from the pre-existing bellows flaps, which were hinged vertically upon the ankle line, by locating his flaps so as to expand the shoe on the draft line of the overshoe, making the hinge line of the flaps practically at right angles to the draft line, and extending the hinge line below the draft line, and that by this construction strain is avoided, a sufficient opening for the insertion of the inner shoe is furnished, and when the flaps are buckled across the instep the opening is contracted upon the draft line. The buckle and flap tongue of the arctic overshoe drew equally on each side of the quarter across the instep. The shoe opened on and below the draft line, and was contracted on the same line. It opened between the vamp and the quarter, near the sole, at the arch of the shank. Into such a shoe the patentee desired to put bellows flaps. He had very little room for choice as to the place where they were to be put. They must be placed so as to continue the opening on the draft line, and could be successfully placed nowhere else. The hinge line of the flap must run forward to a point near the arch of the shank in order to give sufficient room, and to be about at right angles with the draft line. As matter of fact the direction and position of the hinge line of the Williams shoe were substantially the same as the direction and position of the opening between the vamp and quarter in the arctic shoe, except that in the latter the quarter overlapped the vamp at the line of the foxing, near the sole. Unless the idea of putting expansible bellows flaps upon an arctic overshoe was the conception of an inventive mind, the position and location of the flaps and the location of the hinge line were matters which do not rise to the dignity of invention, because they are within the scope of the skilled workman. In view of the Norris and the Evory & Heston shoes, of which the public is presumed to have had knowledge, I do not think that the conception of bellows flaps in a rubber overshoe was an inventive idea.

The remaining point is that the patentee, after many experiments, abandoned separate gores as useless, and made his flaps integral with the vamp and quarter. The separate gore idea is the one which would first naturally occur to any one when thinking of the way in which flaps could be made; but it cannot be safely contended that making the extensions of the vamp integral with it, instead of by the use of gores, involved invention. Experiment would promptly show the inutility of separate gores, by reason of the strain that would come upon the seams and at the apex in the act of drawing the shoe upon the foot, but the substitution of an integral extension for a gore appears to me to be a matter which would naturally promptly occur to the shoemaker.

I place no importance upon the Letherbury patent of June 4, 1867, which was for a folded enlargement of the leg of a boot, the folds being buckled together.     Neither this device nor the Kilsheimer patent of May 10, 1870, seems to me to have weight in the case.     The Williams improvement approaches the border line of invention, and it is very likely that upon the testimony in the case it would have been generally held patentable by the circuit courts before the recent decisions of the supreme court on the subject of invention.     The tendency of those decisions is to confine patentability within narrower limits than formerly. They especially demand that a device which is an improvement upon a pre-existing one must, in order to be patentable, contain a new idea, and perform some new function, and not present changes of degree only, or simply "new or more extended applications of the original thought." *Smith* v. *Nichols*, 21 Wall. 112; *Burt* v. *Evory*, 133 U. S. 349, 10 Sup. Ct. Rep. 394.

Patent No. 166,669, known in the case as the "Patent of 1875," is described in the specification as follows:

"My improved boot consists, in fact, of an inner and an outer upper and a suitable sole, the inner upper being made to fit the last, and therefore requiring to be slit open from near the sole upward, while the outer upper is made much larger than the inner upper, and requires the surplus stock to be overlapped and fastened in order to fit the boot closely to the ankle and leg.     My invention, further, consists in a boot made with an overlapping leg section and an overlapping ankle section, the latter being provided with a so-called 'bellows flap,' formed of continuations of the front and rear uppers; and my invention, still further, consists in a peculiar outline of the edge of the overlapping section at a point adjacent to the ankle."

The claims, of which the first only is said to have been infringed, are as follows:

"(1) The improved boot composed of textile fabric and rubber, having an inner upper cut to fit the last or foot, and an outer upper cut larger than the inner upper, with the surplus portion thereof overlapped, substantially as described.     (2) The improved boot, having an open overlapping leg section and the overlapping ankle section, provided with the bellows flap, formed of continuations of the front and rear uppers, substantially as described.     (3) In a boot, the overlapping leg and ankle section, provided with the recess, D, at the edge between the said sections, substantially as described."

The flaps in the shoe of 1872 were lined with the same thick material which was used inside the shoe, and were therefore clumsy.     This method of lining the flaps was caused by the manner in which the shoe was made.     The inside lining was cut to conform to the outside cloth upper.     The two were placed together, "built up," and a finished upper was formed before placing it upon the last.     After the patent of 1875 the plaintiffs lined the flaps with a thin material, which they were enabled to do by making the shoes in the following way:     The inner lining is fitted to the last.     The outer upper is cut larger than the inner, and the united vamp and quarter, which is divided at the heel, are put together upon the inner lining, and, except the bellows flaps, are secured thereto.     The shoe is vulcanized, and the inner lining is

slitted to permit the removal of the shoe from the last. The old arctic was also made by first fitting the lining to the last, and then "building up" the outer upper upon it, but the vamp and quarter were put on the inner lining separately. Herein is the distinction between the method of the shoe of 1875 and the arctic method. In the 1875 shoe the vamp and quarter are united together before being placed upon the inner lining. In the *Candee Case* the novelty and patentability of the 1875 patent were not denied. In this case both are denied.

The first point which the defendant makes is that the history of the patent, as it progressed through the patent-office, shows that it was granted for a boot as distinguished from a shoe. The argument of counsel is not that the first claim, taken by itself, showed that the improvement was for a boot as distinguished from a shoe, or that a patent for an improved boot is necessarily to be construed as including only a covering for the foot and leg, any more than that a patent for an improved table-spoon excludes the like improvement in a tea-spoon; but the contention is that the application was presented and urged before the patent-office for an improved boot, as distinguished from a shoe, and that under the appearance of obtaining a patent for a boot only the one now in question was obtained, and is presented to the public as covering a thing which was not the subject of the application. It cannot be denied that the original application for this patent was for a leg extension composed of rubber and cloth in overlapping sections, combined with a foot, (all the drawings but one having a foot with bellows flaps,) and that the claim which was asked for was for a rubber and cloth foot, but not necessarily a "bellows flap" foot, and a leg constructed in overlapping sections. An improved rubber and cloth boot, the improvement consisting in a leg constructed in overlapping sections, was the only subject of the application. The first amendment of the specification, and all the correspondence on both sides, and the rejections of the application, both by the examiner and the examiner in chief, proceed unmistakably upon the idea that a patent for a leg section in combination with a foot was asked for. There was no suggestion of novelty in the foot portion. On the other hand, the specification apparently states that the bellows flaps in the foot portion are to be made in accordance with the inventor's various patents of 1872. Finally, the decision of the acting commissioner says:

"I am not prepared to say that no invention may be involved in extending the shoe upwards to form a boot retaining the same manner of folding so as to form a close-fitting, water-tight leg. While the point at which the shoe in its upward extension ceases to be a shoe and becomes a boot may not be always easy to indicate, yet no one fails to recognize these articles, and distinguish the one from the other. I think, however, that the specification and claim are so broad in this case as to include what has already been shown in the art."

This language shows that the head of the office supposed that he was dealing with an application for a boot, as distinguished from and as an improvement upon a shoe. It would be useless to go over this history in

detail, for the sole subject of the application is everywhere manifest. The commissioner having rejected the application upon the ground that the claim was so broad as to be anticipated, the applicant further amended his specification in the manner now presented in the patent as granted. Upon this amendment the examiner says that it is limited to specific features, and, as there is reason to believe some novel points do exist, he recommends that it be accepted for examination. The decision of the commissioner was to the effect that the applicant had asked for a broad claim for a boot as distinguished from a shoe, and that there might be particulars in the extension of the shoe upwards to form a boot which possessed invention. The applicant amended for the purpose of presenting a more limited claim for those particulars. If he had modified his proposed specification so as to clearly show that he had made and claimed an improvement in the method of constructing a bellows-flap shoe, I am not prepared to say that such an amendment would be invalid. But not a word is said in the amended specification of clumsy bellows flaps, and the new way to avoid them. The new specification, read in the light of the previous history, was apparently for specific features of the same combination which had previously been asked for. Read in the light of the subsequent history of the patent, it can be seen that the applicant might then have had another purpose. The principle of estoppel has been frequently applied of late in the construction of letters patent; and a patentee cannot, after obtaining a patent with a misty claim, abandon the express terms of his previous specifications, which clearly specify and limit the invention, and assert that it is for a different and undisclosed thing. He cannot say that it relates to another invention than the one which he had originally represented, and a patent for which he had accepted. In this case the patentee applied for a patent upon a boot as distinguished from a shoe. The patent-office said, "Perhaps you can have a narrow patent for such an article." He amends his application without disclosing a change of subject, obtains his patent, and now claims that it covers an improvement in a shoe. That contention he is estopped from making. The bill is dismissed.